IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| RHONDA THEUS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:09-cv-02296-SHM-dkv |
| ) | |
| vs. ) | |
| ) | |
| GLAXOSMITHKLINE and ) | |
| MICHAEL SMITH, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' LOCAL RULE 7.2(d)(2) STATEMENT
OF UNDISPUTED MATERIAL FACTS**

COMES NOW Defendants GlaxoSmithKline LLC ("GSK") and Michael Smith, pursuant to Local Rule 7.2(d)(2) of the Western District of Tennessee, and sets forth in serial numbered sequence the material facts upon which it relies in support of its Motion for Summary Judgment. The portions of the materials cited as support for these facts are appended to this Statement of Undisputed Material Facts.

1. Plaintiff began working for a predecessor of GSK in August 1998 and became a GSK employee around July 2001.  (Pl. Dep. 34:5-35:7.)

2. Throughout her employment, Plaintiff was responsible for operating machinery that prepared and packaged headache powders at the Memphis plant.  (Pl. Dep. 35:11-36:10.)

3. In early 2007, Plaintiff, using the name "GiniLay," started a business venture in which she posed for sexually-explicit photographs that she published on the Internet and participated in live sexually-explicit videos broadcast over the Internet via "web cam." (Pl. Dep. 46:22-52:3, 53:3-56:7, 57:13-63:20.)

4. While operating her web cam, Plaintiff would disrobe and engage in sexually-explicit conversation and behavior for her customers. (Pl. Dep. 57:22-61:22.)

5. Beginning in July 2007, after some of Plaintiff's co-workers learned of her sexually-explicit websites and activities, Plaintiff claims that she began to experience problems with some of her co-workers. (Pl. Dep. 79:11-22.)

6. On October 3, 2007, Plaintiff lodged her first complaint of co-worker mistreatment with Todd Russell, GSK's Human Resource Advisor, telling Russell that: (i) co-workers were "making jokes and teasing" her, (ii) co-workers joked about putting a nail under her tire, (iii) two female co-workers called her bitch, whore, and slut, (iv) she overheard a female co-worker threaten to fight her, (v) several co-workers had followed her to her home, and (vi) several co-workers had teased her about her relationship with her fiancé. (Pl. Dep. 118:18-130:17, 131:5-11, 132:15-138:19; Pl. Dep. Ex. 10 (attached as Exhibit A); Russell Dec. ¶ 10 (attached as Exhibit B).)

7. Plaintiff acknowledged that she was angry with her co-workers and that she was about to fight one of them. (Pl. Dep. 137:22-138:15; Russell Dec. ¶ 10 (Exhibit B).)

8. Plaintiff did not report any sexual harassment, and she indicated to Russell that the mistreatment was a result of co-worker jealousy and animosity. (Pl. Dep. 136:20-137:4; Russell Dec. ¶¶ 10-11 (Exhibit B).)

9. Russell promptly started an investigation, during which he interviewed Plaintiff and at least seven other GSK employees and contractors, including Joe Ervin, who was serving as Plaintiff's supervisor at that time. (Pl. Dep. 140:3-141:6; Russell Dec. ¶ 12 (Exhibit B).)

10. During these interviews, not a single employee corroborated Plaintiff's allegations. (Russell Dec. ¶ 13 (Exhibit B); Pl. Dep. 141:7-18.)

11. Instead, Plaintiff's co-workers complained that she had exhibited erratic and aggressive behavior toward her co-workers, reporting, among other things, that: (i) Plaintiff discussed her sexually-explicit business activities at work, (ii) Plaintiff threatened to fight her co-workers, (iii) Plaintiff cursed and shouted profanity at her co-workers, calling her female co-workers "bitches and whores," and (iv) Plaintiff deliberately bumped into her co-workers and stared menacingly at them. (Russell Dec. ¶ 13 (Exhibit B); Pl. Dep. 141:7-18.)

12. Upon the completion of his investigation, Russell could not substantiate the allegations made by Plaintiff. (Russell Dec. ¶ 14 (Exhibit B).)

13. Accordingly, no disciplinary actions were taken against the Plaintiff's co-workers, and, notwithstanding the multiple allegations made against Plaintiff, no disciplinary action was taken against her. (Russell Dec. ¶ 14 (Exhibit B); Pl. Dep. 141:16-18.)

14. On October 31, 2007, Plaintiff complained to Russell that her co-workers were continuing to talk about her and follow her home, but that they had not otherwise bothered her at work since her prior complaint. (Pl. Dep. 141:19-22, 142:4-143:14, 143:19-144:1; Russell Dec. ¶¶ 15-16 (Exhibit B).)

15. Plaintiff appeared angry and agitated, and Russell recommended that she contact the Employee Assistance Program that was available to GSK employees and that she contact the police if anyone bothered her at home. (Pl. Dep. 141:23-142:3, 143:19-145:8; Russell Dec. ¶ 17 (Exhibit B).)

16. Starting around November 11, 2007, Plaintiff took a medical leave of absence from employment, during which time she saw several doctors, while continuing to pursue her sexually-explicit business activities. (Pl. Dep. 62:20-23, 145:12-21; Russell Dec. ¶ 18 (Exhibit B).)

17. Plaintiff never complained to any health care providers that she had been sexually harassed, touched inappropriately, or propositioned for dates or sex by any GSK employee or contractor. (Pl. Dep. 117:7-118:17, 166:2-23, 161:15-162:9, 152:16-153:24.)

18. Plaintiff, however, did tell her health care providers that she was contemplating hurting her co-workers: (i) she told Dr. Diner that she contemplated hurting people and had "revenge on her mind" (Pl. Dep. 167:11-168:14); (ii) she told Ms. Streete, her therapist, that she was "close to violence," (Pl. Dep. 163:18-21); and (iii) she told Dr. Patterson that she had thoughts of hurting her co-workers, (Pl. Dep. 158:17-22.)

19. On March 24, 2008, Plaintiff returned to work, at which time Defendant Michael Smith became her supervisor. (Pl. Dep. 172:8-173:12; Russell Dec. ¶ 18 (Exhibit B); Smith Dec. ¶ 5 (attached as Exhibit C).)

20. Soon thereafter, in early April, Plaintiff complained to Smith that someone had broken into her locker (Pl. Dep. 202:16-203:1; Smith Dec. ¶ 6 (Exhibit C), that some of her co-workers had followed her home (Smith Dep. 47:15-48:15; Smith Dec. ¶ 6 (Exhibit C)), and that a female co-worker had threatened to give her car a flat tire (Pl. Dep. 209:18-210:7).

21. At the same time, several of Plaintiff's co-workers complained to Smith that Plaintiff was acting in a threatening manner and had made statements about "guns and shooting

motherfuckers." (Smith Dep. 28:11-29:7, 43:1-45:5; Pl. Dep. 211:24-213:2; Smith Dep. Ex. 1 (attached as Exhibit D); Smith Dec. ¶ 7 (Exhibit C).)

22. Smith promptly reported Plaintiff's and her co-workers' complaints to his supervisors, Troy Hudson and Scott Martin, who asked for human resources assistance. (Smith Dep. 43:1-22, 44:15-45:15; Russell Dec. ¶ 20 (Exhibit B); Smith Dep. Ex. 1 (Exhibit D); Smith Dec. ¶ 8 (Exhibit C).)

23. On April 8, immediately after receiving these reports, Russell started an investigation, during the course of which he interviewed Plaintiff, Smith, and at least eleven other co-workers of Plaintiff. (Pl. Dep. 213:9-13, 213:23-215:8; Russell Dec. ¶ 21 (Exhibit B); Smith Dec. ¶ 9 (Exhibit C); Martin Dep. 7:25-8:5.)

24. Plaintiff's co-workers complained that Plaintiff was cursing at them, acting in an aggressive, erratic, and threatening manner, and threatening workplace violence:

- Ms. Sharp reported that Plaintiff said that "if any of these whores fuck with me, I am going to go to my car and get my pistol and blow their ass away." (Russell Dec. ¶ 22 (Exhibit B); Pl. Dep. 216:23-217:1.)

- Ms. Seals reported that Plaintiff had cursed at her, stared at her in a menacing manner, and intentionally rammed her shoulder into Ms. Seals, and that she had been told that Plaintiff "had a gun for her." (Russell Dec. ¶ 22 (Exhibit B); Pl. Dep. 215:23-216:4, 216:23-217:1.)

- Ms. Merriweather reported that she had heard Ms. Theus say that "if any of these whores fuck with me, I am going to go to my car and get my pistol and blow their ass away." (Russell Dec. ¶ 22 (Exhibit B); Pl. Dep. 215:9-15, 216:23-217:1.)

- Ms. Bowles reported that Plaintiff had bumped into her and stared at her in a menacing manner and that she had heard Ms. Theus kept a gun in her truck. (Russell Dec. ¶ 22 (Exhibit B); Pl. Dep. 216:23-217:1.)

- Mr. Harris reported that Plaintiff told him that "she brings a gun to work and the next time she catches them [her co-workers] in her neighborhood, she is going to blow their head off" and that he heard Plaintiff state that "if any of these whores fuck with me I am going to go to my car and get my

pistol and blow their ass away." (Russell Dec. ¶ 22 (Exhibit B); Pl. Dep. 216:5-22, 216:23-217:1.)

25. When Plaintiff spoke with Russell, she reported that: (i) her co-workers had resumed talking about her and picking on her, (ii) she heard that a co-worker had put a nail under her tire, (iii) a female co-worker had called her bitch, whore, and tramp, (iv) several co-workers had followed her to her home, (v) several co-workers had teased her about her relationship with her fiancé, (vi) two female co-workers had bumped into her, and (vii) someone had broken into her locker. (Pl. Dep. 217:2-221:18; Russell Dec. ¶ 23 (Exhibit B).)

26. Plaintiff testified that only two incidents involving co-workers occurred on or after April 7, 2008: (i) female co-worker Ollie Bowles allegedly bumped her shoulder; and (ii) male co-worker Jerome Foster allegedly witnessed that she had been pulled over by the police. (Pl. Dep. 218:17-21, 219:8-11.)

27. Plaintiff acknowledged that she had told certain co-workers, "don't worry about me, you better worry about yourself," but she denied bringing a gun to work and threatening to shoot them. (Russell Dec. ¶ 24 (Exhibit B); Pl. Dep. 221:2-7.)

28. Plaintiff stated that Vanessa Pulliam and Clarissa Reaves were witnesses who would support her allegations. (Pl. Dep. 221:2-14; Russell Dec. ¶ 23 (Exhibit B).)

29. Plaintiff did not complain of sexual harassment, and again stated her belief that the mistreatment was a result of co-worker animosity and jealousy. (Pl. Dep. 221:24-222:4, 222:12-18, 383:13-23; Russell Dec. ¶¶ 23, 25 (Exhibit B).)

30. Plaintiff was placed on paid administrative leave, pending the completion of the investigation, and was escorted off GSK property. (Pl. Dep. 222:19-223:11; Russell Dec. ¶ 26 (Exhibit B).)

31. Russell then interviewed Pulliam and Reeves, who Plaintiff testified were trustworthy and believable.  (Pl. Dep. 164:20-165:8, 213:23-214:23, 221:8-14; Russell Dec. ¶ 27 (Exhibit B).)

32. Pulliam and Reeves denied witnessing the mistreatment alleged by Plaintiff.  (Russell Dec. ¶ 27 (Exhibit B); Pulliam Dec. ¶ 9 (attached as Exhibit E); Reeves Dec. ¶ 7 (attached as Exhibit F).)

33. Pulliam told Russell that she had never seen anyone harassing or picking on Theus and that Theus had told her that "these people [her co-workers] need to leave me alone before I hurt somebody out here."  (Russell Dec. ¶ 27 (Exhibit B); Pulliam Dec. ¶ 9 (Exhibit E); Pl. Dep. 215:3-8.)

34. Reeves told Russell that she had never seen anyone harassing or picking on Plaintiff. (Russell Dec. ¶ 27 (Exhibit B); Reeves Dec. ¶ 7 (Exhibit F); Pl. Dep. 215:3-8.)

35. Russell re-interviewed several employees who had reported that Plaintiff had threatened workplace violence, and they confirmed their prior statements.  (Russell Dec. ¶ 28 (Exhibit B).)

36. Upon his completion of the investigation, Russell concluded that substantial evidence indicated that Plaintiff had violated GSK's Employee Conduct Policy and Violence-Free Workplace Policy.  (Russell Dec. ¶ 29 (Exhibit B); Pl. Dep. 227:17-228:6.)

37. As a result, and after consultation with GSK's legal department and a senior human resources employee, Russell terminated Plaintiff's employment, effective April 25, 2008. (Russell Dec. ¶ 30 (Exhibit B); Pl. Dep. 226:15-227:16; Pl. Dep. Ex. 12 (attached as Exhibit G); Martin Dep. 10:23-11:7.)

38. Neither Smith nor any supervisor of Plaintiff was consulted or in any way participated in the decisions to suspend and terminate Plaintiff's employment. (Russell Dec. ¶ 31 (Exhibit B); Pl. Dep. 227:17-228:6; Smith Dec. ¶ 11 (Exhibit C.)

39. After commencing this lawsuit, Plaintiff, for the first time, claimed that she experienced supervisor harassment during the course of her GSK employment. Specifically, she now claims that, between March 24, 2008 and April 5, 2008 (Pl. Dep. 412:5-9), Smith: (i) on one occasion, while saying nothing, "brushed up" against her, "threw kisses" at her, and winked at her (Pl. Dep. 231:21-235:21), (ii) on another occasion, asked Plaintiff to dinner (Pl. Dep. 237:9-238:11), and (iii) on another occasion asked whether she had reconsidered his prior dinner invitation (Pl. Dep. 235:23-236:23).

40. Plaintiff acknowledges that after she declined his alleged invitations Smith took no adverse action against her. (Pl. Dep. 262:6-18.)

41. In addition, Plaintiff, for the first time, claimed that: (i) co-worker Marcus Harris massaged her shoulder on two occasions, touched her hand and leg on another occasion, propositioned her for sex on another occasion, bumped into her and stared at her, asked her out on dates, and spread false rumors about their relationship (Pl. Dep. 101:1-111:3), (ii) co-worker Jerome Foster asked her out on dates and to have sex and on one occasion touched her "butt" and knee several times (Pl. Dep. 111:4-116:6), (iii) various other co-workers asked her out on dates (Pl. Dep. 281:14-282:15, 375:21-23, 377:6-24, 388:22-389:1), and (iv) her co-workers, especially her female co-workers, regularly called her offensive names like "bitch, whore, slut, troublemaker, [and] internet whore" (Pl. Dep. 79:23-80:6).

42. Plaintiff claims that she rejected all but one invitation for a date and that, following her rejections, her co-workers laughed and called her names. (Pl. Dep. 390:3-10, 390:23-391:4, 392:15-17.)

43. Plaintiff contends that her co-workers engaged in this conduct because they did not like her and were jealous of her, as a result of her sexually-explicit business activities. (Pl. Dep. 81:3-9, 91:14-92:1, 98:5-9, 179:9-12, 383:13-23.)

44. Plaintiff admits that she never reported (a) that she had been touched, inappropriately or otherwise, by *any* GSK employee or contractor; (b) that she had been sexually harassed by *any* GSK employee or contractor; (c) that *any* GSK employee or contractor had mistreated her because she is a woman; (d) that *any* GSK employee or contractor had propositioned her for sex; or (e) that she had been harassed or bothered in any way by *any* GSK supervisor, but she now claims that, on one occasion, she told Smith that Foster had asked her on a date. (Pl. Dep. 139:12-140:2, 221:19-222:4, 222:12-18, 235:9-21, 284:9-12, 287:10-22, 180:12-182:7; Russell Dec. ¶¶ 32-33 (Exhibit B).)

45. GSK established, published, and made available an anti-harassment policy to all of the employees at the plant. This policy required supervisors to report harassment, permitted formal and informal complaints, and provided a mechanism for bypassing a harassing supervisor. GSK provided anti-harassment training to all employees at the plant, and Plaintiff acknowledged receiving the anti-harassment policy and training. (Russell Dec. ¶¶ 4-9 (Exhibit B); Pl. Dep. 46:1-21; Pl. Dep. Ex. 5 ((attached as Exhibit H).)

46. During the course of litigation, Plaintiff testified that she has experienced no change in her daily routine since February 2008, other than the cessation of her sexually-explicit

business activities, and that she is a "happy mom" and an "ordinary suburban housewife."

Pl. Dep. 334:6-335:4.)

This the 29 day of January, 2010.

        SMITH, ANDERSON, BLOUNT, DORSETT,
        MITCHELL & JERNIGAN, L.L.P

        By:  s/ Catherine E. Lee
        Kerry Shad
        N.C. State Bar No. 18410
        Zebulon D. Anderson
        N.C. State Bar No. 20831
        Catherine E. Lee
        N.C. State Bar No. 35375
        Post Office Box 2611
        Raleigh, North Carolina 27602-2611
        Telephone:    (919) 821-1220
        Facsimile:    (919) 821-6800
        E-Mail: kshad@smithlaw.com
                zanderson@smithlaw.com
                clee@smithlaw.com

*Attorneys for Defendants*

        BAKER, DONELSON, BEARMAN,
          CALDWELL & BERKOWITZ, P.C.

        By: s/ Jay A. Ebelhar
        Angie C. Davis
        Tennessee Bar No. 20043
        Jay A. Ebelhar
        Tennessee Bar No. 22770
        2000 First Tennessee Building
        165 Madison Avenue
        Memphis, Tennessee  38103
        Telephone:    (901) 577-8110
        Facsimile:    (901) 577-0893
        E-Mail: angiedavis@bakerdonelson.com
                jebelhar@bakerdonelson.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following:

>Edgar Davison
>The Davison Law Firm
>6000 Poplar Avenue, Suite 250
>Memphis, Tennessee 38119
>(901) 271-5566
>edgar@davisonlawfirm.net

/s/ Catherine E. Lee
Catherine E. Lee
